THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| WAYNE LAND AND MIINERAL GROUP, LLC, | : <br> : CIVIL ACTION NO. 3:16-CV-897 <br> : (JUDGE MARIANI) |
| Plaintiff, | : <br> : |
| v. | : <br> : |
| DELAWARE RIVER BASIN COMMISSION, | : <br> : |
| Defendant, and | : <br> : |
| DELAWARE RIVERKEEPER NETWORK, et al., | : <br> : |
| Intervenors-Defendants. | : |

**MEMORANDUM OPINION**

**I. INTRODUCTION**

Here the Court considers Defendant Delaware River Basin Commission's Motion for Partial Summary Judgment (Doc. 169). With the Motion, Defendant Delaware River Basin Commission ("DRBC" "Defendant") asks the Court to declare that Plaintiff Wayne Land and Mineral Group, LLC's "planned activities and planned facilities including structures, machinery and equipment, to be undertaken, constructed or operated for the purpose of managing wastewater and related uses of land, are a 'project' within the meaning of the Delaware River Basin Compact." (Doc. 169 at 43.) Plaintiff responds that the Motion presents a "pivot[] away from the rationale" Defendant has relied on since 2009 where it

"has maintained that a natural gas well pad, including appurtenant equipment used to drill a gas well pad is '**a** project' over which it has jurisdiction." (Doc. 184 at 1 (emphasis added by Plaintiff).) Plaintiff asserts that the Court should deny the relief sought because it is not supported by relevant evidence. (*Id.* at 3-4.) Plaintiff also maintains that summary judgment should be granted to WLMG pursuant to Federal Rule of Civil Procedure 56(f)(1). (Doc. 184 at 9.) For the reasons that follow, the Court concludes that Defendant's Motion is properly denied and Plaintiff is not entitled to summary judgment in its favor.

## II. PROCEDURAL HISTORY

On May 17, 2016, Plaintiff Wayne Land & Mineral Group LLC ("WLMG" "Plaintiff") filed a Complaint against Defendant Delaware River Basin Commission (the "DRBC"). (Doc. 1.) In the Complaint, Plaintiff asks the Court to enter a declaratory judgment holding that DRBC "does not have jurisdiction over, or the authority to review and approve, or to require WLMG to seek prior approval from the [DRBC] for, or to otherwise preclude the development of, WLMG's proposed well pad, appurtenant facilities or the related activities to be carried out on the Property." (Doc. 1 at 18.) WLMG owns approximately 180 acres of land, including the natural gas and minerals present on the land, in Wayne County, Pennsylvania. (Doc. 1 ¶ 12.) Approximately 75 acres of the land owned by WLMG is located in the Delaware River Basin. (*Id.*)

Intervenors-Defendants the Delaware Riverkeeper Network and Maya K. Van Rossum, the Delaware Riverkeeper (collectively referred to as the "DRN") filed a motion to intervene on July 5, 2015, (Doc. 10) which the Court granted on September 12, 2016, (Doc. 26).[1]

On March 23, 2017, the Court granted Defendant Delaware River Basin Commission's Motion to Dismiss the Complaint (Doc. 12) and closed the case. (Doc. 93.) Plaintiff appealed the Court's dismissal to the United States Court of Appeals for the Third Circuit. (Doc. 94.) The Circuit Court entered Judgment on July 3, 2018, ordering that the District Court's Order entered on March 23, 2017, be vacated and the case be remanded to this Court for further proceedings. (Doc. 97.)

Following remand, the Court reopened the case (Doc. 98) and, on August 27, 2018, issued an Order establishing the pretrial schedule (Doc. 107). The schedule was amended numerous times (*see*, *e.g.*, Docs. 107, 124, 134, 135). Following the resolution of discovery disputes (*see* Docs. 163-168), Defendant filed the Motion under consideration here on April 7, 2020 (Doc. 169) along with its Concise Statement of Material Facts (Doc. 169-3).

---

[1] DRN describes itself as a not-for-profit organization established in 1988 whose purpose is "to protect, preserve, and enhance the Delaware River, all of its tributary streams, and the habitats and communities of the Basin." (*Id.* at 2-3). It has over 15,000 members and works on issues, actions, regulations, legislation, policies, programs, and decisions that impact the health of the Delaware River Basin. (*Id.* at 3). In this matter, the DRN "seeks to intervene to defend the validity of DRBC's jurisdiction and authority over activities that may affect the water resources of the Basin and to protect and preserve the interests of DRN and its members in the Basin." (*Id.* at 2).

Defendant filed its supporting brief (Doc. 175) on May 4, 2020, having requested, and been

granted, an extension of time within which to do so (Docs. 173, 174).  Plaintiff filed its

response to Defendant's Statement of Material Facts (Doc. 183) and its brief in opposition to

Defendant's Motion (Doc. 184) June 3, 2020.  Defendant filed its reply brief (Doc. 191) on

June 24, 2020.  Therefore, this Motion is fully briefed and ripe for disposition.

### III. FACTUAL BACKGROUND

As the Court has previously explained,

> the Delaware River Basin Compact (the "Compact") is an interstate compact
> dated November 2, 1961, by and among the Commonwealth of Pennsylvania,
> New York State, New Jersey, Delaware, and the United States.  The purpose
> of the Compact is the conservation, utilization, development, management and
> control of the water and related resources of the Delaware River Basin. The
> Compact created the Defendant DRBC, which is tasked with the adoption and
> promotion of uniform and coordinated policies for water conservation, control,
> use and management in the Delaware River Basin.

(Doc. 67 at 2-3 (internal citations omitted).)

With the present action, WLMG seeks a declaration that its proposed natural gas

development activities on land within the Delaware River Basin are not a "project" as

defined in the Delaware River Basin Compact, and, therefore, DRBC does not have

authority to review the proposed activities under Section 3.8 of the Compact.  (Doc. 1.)

Article 3 of the Delaware River Basin Compact ("Compact" "Delaware Compact")

sets out the "Powers and Duties of the Commission."  Section 3.8 addresses "Referral and

Review" and specifically provides as follows:

No project having a substantial effect on the water resources of the basin shall hereafter be undertaken by any person, corporation or governmental authority unless it shall have been first submitted to and approved by the commission, subject to the provisions of Sections 3.3 and 3.5. The commission shall approve a project whenever it finds and determines that such project would not substantially impair or conflict with the comprehensive plan and may modify and approve as modified, or may disapprove any such project whenever it finds and determines that the project would substantially impair or conflict with such plan.

Compact § 3.8.  The Compact defines "project" to mean

any work, service or activity which is separately planned, financed, or identified by the commission, or any separate facility undertaken or to be undertaken within a specified area, for the conservation, utilization, control, development or management of water resources which can be established and utilized independently or as an addition to an existing facility, and can be considered as a separate entity for purposes of evaluation[.]

Compact § 1.2(g).

The definitional section of the Compact also provides that "'[w]ater resources' shall

include water and related natural resources in, on, under, or above the ground, including

related uses of land, which are subject to beneficial use, ownership or control."  Compact §

1.2(i).  The Compact defines "facility" as:

any real or personal property, within or without the basin, and improvements thereof or thereon, and any and all rights of way, water, water rights, plants, structures, machinery and equipment, acquired, constructed, operated or maintained for the beneficial use of water resources or related land uses including, without limiting the generality of the foregoing, any and all things and appurtenances necessary, useful or convenient for the control, collection, storage, withdrawal, diversion, release, treatment, transmission, sale or exchange of water; or for navigation thereon, or the development and use of hydroelectric energy and power, and public recreational facilities; or the propagation of fish and wildlife; or to conserve and protect the water resources

of the basin or any existing or future water supply source, or to facilitate any other uses of any of them[.]

Compact § 1.2(e).

Previously, in considering Defendant Delaware River Basin Commission's Motion to Dismiss the Complaint (Doc. 12), the Court determined that the issue presented the need to interpret terms of the contract, specifically the meaning of "project" under Section 1.2(g) as informed by the meaning of "water resources" under Section 1.2(i).  (Doc. 92 at 40.)  The Court granted the motion to dismiss based on the following findings:

> On the face of Plaintiff's Complaint . . . it is apparent that its proposed activities within the Delaware River Basin constitute a "project" within the meaning of that term as defined in Sections 1.2(g) and 1.2(i) of the Compact.  Accordingly, the Compact requires Plaintiff to submit an application to the Commission for a determination as to whether its proposed "project" has a "substantial effect on the water resources of the Basin" and, if so, whether the Commission shall approve or disapprove such project based on its determination that the project would or would not substantially impair or conflict with the Commission's comprehensive plan.  Compact at § 3.8.

(Doc. 92 at 43.)  The Circuit Court confirmed that the Compact was to be "construed as a contract under the principles of contract law."  *Wayne Land and Mineral Group LLC v. Delaware River Basin Commission*, 894 F.3d 509, 527 (3d Cir. 2018).  However, the Circuit Court disagreed with this Court's determination that the proposed activities constituted a "project," concluding that "the meaning of the word 'project' as used in the compact is ambiguous" and, therefore, the district court's decision on the merits was premature.  *Id.* The Circuit Court explained that

6

[b]ecause we interpret the Compact as a contract and we have determined that it is ambiguous as to whether Wayne's proposed activities are subject to the Commission's project review authority under § 3.8, we are left to use "other interpretive tools to shed light on the intent of the Compact's drafters." *Tarrant* [*Reg'l Water Dist. V. Herrmann*, 569 U.S. 614, 631 (2013)]. The problem, however, is that those interpretive tools require factual determinations to be made about the Compact drafters' intent. *See Sumitomo Machinery Corp. of Am., Inc. v. AlliedSignal, Inc.*, 81 F.3d 328, 335 (3d Cir. 1996) (remanding a contractual dispute to the district court for further fact-finding because, "[w]hen a contract is ambiguous, the 'fact-finder must attempt to discover what the contracting parties ... intended [the disputed provisions] to mean' " (alterations in original) (citation omitted) ). The District Court must have the opportunity to evaluate in the first instance how other interstate compacts, the parties' course of performance, and the negotiation and legislative history of the Compact, among other evidence, bear on the question of intent. The interpretation that should prevail is the one that aligns best with the drafters' intent.

894 F.3d at 534.

Thus, the posture of this case upon remand is for the Court to evaluate the identified interpretive tools' bearing on the question of intent. From this baseline, the Court will consider DRBC's Motion now under consideration.

### III. STATEMENT OF UNDISPUTED FACTS

The Concise Statement of Material Facts in Support of Defendant Delaware River Basin Commission's Motion for Partial Summary Judgment contains thirty-nine (39) numbered paragraphs, each with citations to the record. (Doc. 169-3.)

Local Rule ("LR") 56.1 of the Rules of Court for the Middle District of Pennsylvania requires that a motion for summary judgment filed pursuant to Federal Rule of Civil Procedure 56

shall be accompanied by a separate, short and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried.

The papers opposing a motion for summary judgment shall include a separate, short and concise statement of the material facts, responding to the numbered paragraphs set forth in the statement required in the foregoing paragraph, as to which it is contended that there exists a genuine issue to be tried.

Statements of material facts in support of, or in opposition to, a motion shall include references to the parts of the record that support the statements.

All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party.

M.D. Pa. LR 56.1.

Here DRBC's assessment of what facts present no genuine issue to be tried differs markedly from WLMG's assessment in that WLMG formally admits only two statements of fact. Thus, the recitation of facts which are clearly undisputed is very brief.

The parties agree that WLMG owns approximately 180 acres of land in Wayne County, Pennsylvania, and approximately 75 acres of WLMG's property are located in the Delaware River Basin (the "Property"). (Doc. 169-3 ¶ 1 (citing Doc. 1 ¶ 12); Doc. 183 ¶ 1.) They also agree that WLMG plans to use the largest quantity of water in the well completion and hydraulic fracturing stage, and the amount of water required for this stage is proportionate to the depth and lateral length of a well. (Doc. 169-3 ¶ 7 (citing Holko Letter at WLMG2230); Doc. 183 ¶ 7.)

Of the remaining thirty-seven paragraphs, six are disputed (Doc. 183 ¶¶ 4, 9, 28, 34, 37, 38) and thirty-one are "disputed as stated" (*id.* ¶¶ 2, 3, 5, 6, 8, 10-27, 29-33, 35, 36, 39). In some "disputed as stated" paragraphs, WLMG admits some facts contained within DRBC's corresponding statements. (Doc. 183 ¶¶ 11, 19, 20, 33, 39.) Thus, WLMG makes limited admissions in the five identified paragraphs which the Court will set out below.

In response to DRBC's statement in paragraph 11 that "WLMG has not yet selected the specific chemicals or other material it intends to add to the millions of gallons of water it plans to use to form its fracture fluid," WLMG eliminates the amount of water to be used in its admission that "WLMG has not yet selected the specific chemicals it will use in the mixture of water, sand and small amount of dilute chemicals that will be injected into the well under high pressure to hydraulically fracture – or open – the shale, allowing natural gas to be released from the rock." (Doc. 169-3 ¶ 11 (citation omitted); Doc. 183 ¶ 11 (citation omitted).)[2]

In paragraph 19, DRBC identifies structures, machinery, and equipment which it avers WLMG "plans to deploy" to "manage flowback water (together with formation brine) and produced water, and to contain any leaks, spills or releases of wastewater and other substances." (Doc. 169-3 ¶ 19.) WLMG responds that "[i]t is admitted that all wastewater generated by WLMG's proposed natural gas development activities, will be managed by

---

[2] WLMG follows the quoted material in ¶ 11 with an explanation as to why it has not yet selected specific chemicals to be used. (Doc. 183 ¶ 11.)

properly licensed and/or permitted entities other than WLMG" and that "[s]uch wastewater management, which [is] part of a larger undertaking and for the purpose of natural gas development . . . , may include the tanks and other equipment described" by DRBC.  (Doc. 183 ¶ 19 (citations omitted).)

Eliminating the detail set out in DRBC's paragraph 20, including the amount of water to be managed and that the purpose of the wastewater management plan will be "to manage the wastewater to conserve and protect the water resources of the Basin" (Doc. 169-3 ¶ 20 (citations omitted)), WLMG admits that it will have a wastewater management plan so that all wastewater generated by WLMG's proposed natural gas development activities, including flowback, will be managed in accordance with applicable laws and regulations (Doc. 183 ¶ 20 (citations omitted)).

WLMG, while disputing whether the amendment to the Comprehensive Plan set out in DRBC's paragraph 33 was proper because, based on the plain language of Section 13.1 of the Compact, only "projects" and "facilities" belong in the Commission's Comprehensive Plan and Commission resolutions and regulations are not "projects" or "facilities," admits that "in 1964, the five Commissioners unanimously approved "[a] resolution to amend the Comprehensive Plan with respect to ground waters" which was adopted as Section 2.20.6 of DRBC's Water Code and incorporated into DRBC's Comprehensive Plan. (Doc. 183 ¶ 33 (citing WLMG Ex. 5 (Littlefield Deposition) at 151-154.).)  The amendment provides as follows:

"The underground water resources of the Basin shall be utilized, conserved, developed, managed and controlled in view of the needs of present and future generations, and of the resources available to them. To that end, the use, interference, impairment, **penetration** or artificial recharge **of an aquifer** or of any other underground water resource **shall be subject to review and evaluation under the Compact."**

(Doc. 169-3 ¶ 33 (quoting DRBC Resolutions 64-8 and 64-11 (emphasis added by DRBC) (attached to the Bush Declaration as Exhibit 13).)

In response to DRBC's statement in paragraph 39 that "[t]he Commonwealth of Pennsylvania by regulation mandates many of the activities and structures WLMG plans to employ to manage wastewater for the purpose of conserving and minimizing pollution of water resources. 25 Pa. Code § 78a.1 et seq." (Doc. 169-3 ¶ 39), WLMG admits that PaDEP regulates natural gas development activities, including management of wastewater generated by such activities, but states that the regulations are irrelevant to the determination of whether those activities are a "project" for purposes of the Compact (Doc. 183 ¶ 39).

## IV. STANDARD OF REVIEW

Summary judgment "is appropriate only where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Gonzalez v. AMR*, 549 F.3d 219, 223 (3d Cir. 2008). "An issue is genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party, and a factual dispute is material only if it might affect the outcome of the suit under governing law." *Kaucher v. County*

*of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).  Thus, through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact."  Fed. R. Civ. P. 56(a).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).  Once such a showing has been made, the non-moving party must offer specific facts contradicting those averred by the movant to establish a genuine issue of material fact.  *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990).  Therefore, the non-moving party may not oppose summary judgment simply on the basis of the pleadings, or on conclusory statements that a factual issue exists.  *Anderson*, 477 U.S. at 248.  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record . . . or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1)(A)-(B).  In evaluating whether summary judgment should be granted, "[t]he court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).  "Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true."  *Big Apple BMW, Inc. v. BMW of N.*

*Am., Inc.,* 974 F.2d 1358, 1363 (3d Cir. 1992), *cert. denied* 507 U.S. 912, 113 S. Ct. 1262,

122 L. Ed. 2d 659 (1993).

However, "facts must be viewed in the light most favorable to the nonmoving party

only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380, 127

S. Ct. 1769, 167 L. Ed. 2d 686 (2007). If a party has carried its burden under the summary

judgment rule,

> its opponent must do more than simply show that there is some metaphysical
> doubt as to the material facts. Where the record taken as a whole could not
> lead a rational trier of fact to find for the nonmoving party, there is no genuine
> issue for trial. The mere existence of some alleged factual dispute between the
> parties will not defeat an otherwise properly supported motion for summary
> judgment; the requirement is that there be no *genuine* issue of *material* fact.
> When opposing parties tell two different stories, one of which is blatantly
> contradicted by the record, so that no reasonable jury could believe it, a court
> should not adopt that version of the facts for purposes of ruling on a motion for
> summary judgment.

*Id.* (internal quotations, citations, and alterations omitted).

"In considering a motion for summary judgment, a district court may not make

credibility determinations or engage in any weighing of evidence." *Anderson*, 477 U.S.

at 255. Therefore, when evidentiary facts are in dispute, when the credibility of

witnesses may be in issue, or when conflicting evidence must be weighed, a full trial

is usually necessary.

The standard for granting summary judgment in a declaratory judgment action is the

same as for any other type of relief. *Cloverland-Green Spring Dairies, Inc. v. Pa. Milk*

*Marketing Board*, 298 F.3d 201, 210 n.12 (3d Cir. 2002).

When the issue before the court involves ambiguity in a contract, the Court of Appeals for the Third Circuit has endorsed the principle that, "'as a general matter, . . . when a contract is ambiguous, its interpretation becomes a question of fact and summary judgment is inappropriate.'" *In re Color Tile Inc.*, 475 F.3d 508, 515-16 (3d Cir. 2007) (quoting *Mellon Bank, N.A. v. United Bank Corp. of New York*, 31 F.3d 113, 116 (2d Cir. 1994). *Mellon Bank* further explained that

> [w]e have recently clarified this general rule to emphasize that ambiguity itself is not enough to preclude summary judgment. Rather, in order for the parties' intent to become an issue of fact barring summary judgment, there must also exist relevant extrinsic evidence of the parties' actual intent. *See Williams & Sons,* 983 F.2d at 1183–84 ("Ambiguity without the existence of extrinsic evidence of intent presents not an issue of fact, but an issue of law for the court to rule on.") (citing *Antilles Steamship Co. v. Members of Am. Hull Ins. Syndicate,* 733 F.2d 195, 207 (2d Cir.1984) (Newman, J., concurring)); *see also Seiden Assocs., Inc. v. ANC Holdings, Inc.,* 959 F.2d 425, 428 (2d Cir.1992).

*Mellon Bank, N.A. v. United Bank Corp. of New York*, 31 F.3d 113, 116 (2d Cir. 1994). A court may also grant summary judgment regarding the interpretation of ambiguous language if the non-moving party fails to point to any relevant extrinsic evidence supporting that party's interpretation of the language. *Mellon Bank,* 31 F.3d at 116. The Second Circuit has also held that "the court may resolve ambiguity in contractual language as a matter of law if the evidence presented about the parties' intended meaning [is] so one-sided that no reasonable person could decide the contrary." *3Com Corp. v. Banco do Brasil, S.A.,* 171 F.3d 739, 746–47 (2d Cir.1999) (internal quotation marks omitted); *Shepley v. New Coleman Holdings Inc.,* 174 F.3d 65, 72 n. 5 (2d Cir.1999) (summary judgment in a

contract dispute may be granted "when the language is ambiguous and there is relevant

extrinsic evidence, but the extrinsic evidence creates no genuine issue of material fact and

permits interpretation of the agreement as a matter of law") (internal quotation marks

omitted).

Pursuant to Federal Rule of Civil Procedure 56(f), the court may grant summary

judgment for the nonmovant after giving notice and a reasonable opportunity to respond.

Fed. R. Civ. P. 56(f)(1).

## V. ANALYSIS

Ordinarily, the Court's analysis in considering a motion for summary judgment flows

from the material facts upon which the parties agree, testing their sufficiency based on the

standard set out above.  However, that task is challenging here because of the limited

number of agreed upon facts, consideration of the materiality of those facts which are

"disputed," and the difficulty in parsing the materiality of facts "disputed as stated."

Perhaps in view of the divergence between the parties concerning what is a genuine

disputed issue for trial, DRBC provides eight "uncontested material facts" in its reply brief

which it asserts are sufficient to support the pending Motion.  (Doc. 191 at 3-5.)  DRBC

maintains that WLMG has either admitted or not contested these key facts:

> a. WLMG plans to conduct activities and operate structures and equipment
> (*i.e.*, facilities) to manage, conserve, and protect water resources, including
> ground and surface water resources and related uses of land. WLMG RSMF
> ¶¶ 19-20.

15

b. Regarding well casings designed to protect groundwater, WLMG will "include the initial drilling and casing of the wellbore to prevent any contamination between deeper gas reservoirs, water zones and other formations. . . . Additional casings of 13-3/8 inches and 9-5/8 inches will be utilized to isolate freshwater zones and other zones that may be of concern." WLMG RSMF ¶ 5.

c. During WLMG's planned drilling phase, fracture fluid consisting of millions of gallons of water and chemical modifiers will be injected into the wellbore under high pressure. WLMG RSMF ¶¶ 8, 11.

d. Following the injection of fracture fluids during well stimulation, a mixture of these fluids (including chemical modifiers) and formation brine will return to the surface as "flowback." DRBC SMF ¶ 10-16; WLMG RSMF ¶ 14.

e. WLMG's flowback water and formation brine will be collected in temporary storage containers and managed. DRBC SMF ¶ 15; WLMG RSMF ¶ 2.

f. WLMG's plans may also involve up to twenty 21,000-gallon polypropylene or steel walled tanks, one 12,600-gallon storage tank for every well drilled for the remaining life of the well, protective casings within the borehole of each well, and secondary containment such as berms and geosynthetic liners. DRBC SMF ¶ 19; WLMG RSMF ¶ 19.

g. WLMG admitted its wastewater management "may include the tanks and other equipment described in Commission SMF ¶19." WLMG RSMF ¶ 19. WLMG further admits it will have a wastewater management plan, WLMG RSMF ¶ 20, although the plan has yet to be prepared. DRBC SMF ¶ 20.

h. Improper management, treatment, and disposal of wastewater from high volume hydraulic fracturing ("HVHF") has the potential to impair water resources and their uses in the Basin. DRBC SMF ¶ 16 (citing Mouser at 15-17).

(Doc. 191 at 3-5.)

As an initial matter, the Court rejects DRBC's assertion that paragraphs (a), (c), and

(d) are "uncontested material facts" (Doc. 191 at 3).   Paragraph (a) contains terms and

phrases specifically defined in the Compact which are not found in the paragraphs to which

DRBC cites, WLMG RSMF ¶¶ 19-20.  (*Id.*)  Paragraph (c) contains a definitive statement about the amount of water WLMG will use during the planned drilling phase which is not found in the paragraphs to which DRBC cites, WLMG RSMF ¶¶ 8, 11.  Paragraph (d) cites to seven paragraphs in DRBC's Statement of Material Facts which WLMG "disputed as stated" (Doc. 169-3 ¶¶ 10-16; Doc. 183 ¶¶ 10-16), five of which WLMG claimed to be irrelevant (Doc. 183 ¶¶ 12-16), and DRBC's citation to WLMG's responsive filing, WLMG RSMF ¶ 14, does not affirm the proposition for which it is cited.  By way of clarification, although WLMG states that paragraph 16 of DRBC's Concise Statement of Material Facts is irrelevant (Doc. 183 ¶ 16), WLMG does not provide any citation to the record in support of its response (Doc. 183 ¶ 16), and DRBC supports the relevance of the statement in its reply brief (Doc. 191 at 5 n.2).  Because WLMG does not include "references to the parts of the record that support the statement[]," pursuant to LR 56.1, DRBC's paragraph 16 will be deemed admitted.  Consequently paragraph (h) set out above will be considered "an uncontested material fact" for purposes of this Memorandum Opinion along with paragraphs (b), (e), (f), and (g).

 Based on this determination, the Court will consider the following to be the "uncontested material facts" which DRBC asserts are sufficient to support the pending Motion.  (Doc. 191 at 3-5.)

- Regarding well casings designed to protect groundwater, WLMG will include the initial drilling and casing of the wellbore to prevent any contamination between

deeper gas reservoirs, water zones and other formations. Additional casings of 13-3/8 inches and 9-5/8 inches will be utilized to isolate freshwater zones and other zones that may be of concern.

- WLMG's flowback water and formation brine will be collected in temporary storage containers and managed.

- WLMG's plans may also involve up to twenty 21,000-gallon polypropylene or steel walled tanks, one 12,600-gallon storage tank for every well drilled for the remaining life of the well, protective casings within the borehole of each well, and secondary containment such as berms and geosynthetic liners.

- WLMG wastewater management may include the tanks and other equipment described by the Commission in SMF ¶19.

- WLMG will have a wastewater management plan although the plan has yet to be prepared.

- Improper management, treatment, and disposal of wastewater from high volume hydraulic fracturing ("HVHF") has the potential to impair water resources and their uses in the Basin.

(Doc. 191 at 3-5, ¶¶ (b), (e), (f), (g), and (h) (quotation marks and citations omitted).)

Taking these assertions together, the Court must consider whether DRBC has shown that it is entitled to summary judgment because there is no genuine issue of material fact that WLMG's "planned activities and planned facilities including structures, machinery

18

and equipment, to be undertaken, constructed or operated for the purpose of managing

wastewater and related uses of land, are a 'project' within the meaning of the Delaware

River Basin Compact" (Doc. 169 at 43), and, therefore, it is entitled to judgment as a

matter of law.  *See*, *e.g.*, *Gonzalez*, 549 F.3d at 223.  DRBC maintains that it is entitled to

summary judgment under the express terms of the Compact and, if the Court determines

ambiguity exists, the relevant interpretive tools support a determination in its favor.  (*See*,

*e.g.*, Doc. 175 at 48, 52.)

## A.  Express Compact Terms

DRBC first argues that, "[u]nder the express terms of the Compact, WLMG's

wastewater management activities, structures and equipment are clearly a project."  (Doc.

175 at 48.)  DRBC acknowledges that generally "[a]t issue in the present case is the

authority of DRBC under Section 3.8 of the Compact to review WLMG's plans to conduct

activities and operate structures at a natural gas well pad site with the potential to pollute

water resources."  (*Id*.)  Recognizing that "[s]ome of these activities, such as the injection

of millions of gallons of fracturing fluids through a drinking water aquifer, are allegedly for

the purpose of extracting natural gas," DRBC maintains that "[o]ther activities and

structures such as berms, well pad liners, protective well bore casings and wastewater

tanks are for the purpose of managing wastewater and protecting and conserving water

resources."  (*Id.* at 48-49.)  DRBC argues that, because its Motion is directed only to the

activities in the latter category, "the literal language of the definition of 'project' compels

19

the conclusion that WLMG's wastewater activities and structures constitute a "project."

(Doc. 175 at 49 (citing *Wayne Land and Mineral Grp., LLC v. Del. River Basin Comm'n*,

2019 WL 2387852, *12 (M.D. Pa. 2019) (Doc. 133) ("Clearly the Circuit Court considered

water consumption, *waste water management, and waste water discharge* integral to the

proposed activity on WLMG's property. . . . Further, Judge Hardiman's assessment that

'an argument can be constructed that a storage tank [which] is constructed appurtenant

to a fracking well is for the storage and utilization of water' (Oral Arg. Tr., Nov. 20, 2017,

at 19:9-18), presents a clear example of the relevance of Plaintiff's specific plans to its

prayer for relief.") (emphasis added by DRBC)).)

In further support of the argument, DRBC states the following:

> Determining whether the full scope of WLMG's planned activities falls within
> the ambit of the Compact's definition of "project" in accordance with the Third
> Circuit's ruling would require resolution of the ambiguity in the definition.
> However, the present limited Motion can be resolved on the express text of
> the definition of "project." Wastewater management activities, structures and
> equipments and related uses of land satisfy both WLMG's and DRBC's
> interpretations of the word "for," and constitute a "project" because they are
> "for the purpose of" managing and conserving water resources (WLMG's
> interpretation), and also comprise a deliberate part of WLMG's plans
> (DRBC's interpretation).  As such, the activities, equipment, and construction
> and operation of structures at WLMG's well pad site for the purpose of
> managing wastewater and related uses of land are a project.

(Doc. 175 at 50-51.)

WLMG responds that the activities/structures identified by DRBC do not satisfy the

Compact definition of project for several reasons, including that they cannot be "considered

a separate entity for purpose of evaluation" as required by the definition of "project" in §

1.2(g) of the Compact.  According to WLMG, "[w]hether viewed piece by piece or as a

collection of equipment, it is illogical to suggest that the equipment would be evaluated other

than as part of the larger undertaking of which the equipment is part."  (Doc. 184 at 15.)

Though DRBC refutes WLMG's assertion that its limited interpretation of the term

"project" sought in its Motion is not supported by the statutory text, the foregoing arguments

show that ambiguity remains as to the Compact's definition of "project" and the Court, at this

stage of the proceedings, should not decide the drafters' intent.  *See supra* pp. 13-14.

Further, the Court finds DRBC's reliance on this Court's June 4, 2019, decision in *Wayne

Land*, 2019 WL 2387852, *12 (M.D. Pa. June 4, 2019) (Doc. 133), misplaced in that the

context was relevance in a motion to compel and the fact that the "Circuit Court

considered water consumption, waste water management, and waste water discharge

integral to the proposed activity on WLMG's property" does not mean the this Court or

the Circuit Court considered the activities/structures identified in the pending Motion to

be a separate project or activities/structures capable of independent evaluation.  *See

supra* pp. 19-20.  The Court also finds reliance on Judge Hardiman's statement to be

misplaced in that, while this Court determined that a statement made at oral argument

could provide a basis to find discovery of WLMG's specific plans relevant, that relevance

does not lend credence to the interpretation of the term "project" now proposed by

DRBC.  Judge Hardiman's statement that "an argument can be constructed that a

21

storage tank [which] is constructed appurtenant to a fracking well is for the storage and

utilization of water" (Oral Arg. Tr., Nov. 20, 2017, at 19:9-18) does not foreclose an

argument to the contrary.

Having determined that this Motion cannot be decided based on the text of the

Compact alone, the Court will now turn to an assessment of the interpretive tools

identified by the Circuit Court as relevant to ascertaining the drafters' intent.

## B. Interpretation of Ambiguity in the Compact

As evidenced by the Procedural and Factual Backgrounds set out above, the Court

clearly does not write on a clean slate.  Because the Circuit Court found the Compact

ambiguous as to whether WLMG's "proposed activities are subject to the Commission's

project review authority under § 3.8," this Court must "use 'other interpretive tools to shed

light on the intent of the Compact's drafters.'"  894 F.3d at 534 (quoting *Tarrant*, 569 U.S. at

631).  To determine that intent, this Court is charged with evaluating "how other interstate

compacts, the parties' course of performance, and the negotiation and legislative history of

the Compact, among other evidence, bear on the question of intent." 894 F.3d at 534. As

the Circuit Court concluded, "[t]he interpretation that should prevail is the one that aligns

best with the drafters' intent."  *Id.*

DRBC's "uncontested material facts" do not satisfy the summary judgment standard

because they do not show that the ambiguity as to whether WLMG's "proposed activities

are subject to the Commission's project review authority under § 3.8" has been resolved.  In

other words, DRBC has not shown, as a matter of law, that the term "project" as set forth in

§ 3.8 of the Delaware River Basin Compact unambiguously encompasses WLMG's

"planned activities and planned facilities including structures, machinery and equipment,

to be undertaken, constructed or operated for the purpose of managing wastewater and

related uses of land" (Doc. 169 at 43).

A review of the facts asserted as uncontested shows that they do not address "how

other interstate compacts, the parties' course of performance, and the negotiation and

legislative history of the Compact, among other evidence, bear on the question of intent."

894 F.3d at 534.  While the facts asserted may ultimately inform how the determinations of

other interstate compacts relate to project review of natural gas development activities in the

Delaware River Basin, there is no concurrence on how other interstate compacts bear on

the question of the intent of the drafters of the Compact.  While certain facts asserted may

be indicative of similarities with projects reviewed in DRBC's course of performance,

distinguishing facts also exist and the parties' briefing of the issue shows disagreement on

whether the course of performance points toward or against project review of natural gas

development activity.  Finally, while certain facts asserted to be uncontested could support

DRBC's position that the negotiation and legislative history of the Compact are indicative of

drafters' intent that would include project review of natural gas development activity, WLMG

contests this view based on citation to the record and reasoned argument.

The Court will not review in detail the parties' extensive briefing of these issues and extrinsic evidence presented in support of their positions.  However, the Court will, by way of example, highlight the parties' disagreements regarding the interpretive tools identified by the Circuit Court.

## 1. Negotiation and Legislative History

The parties present different interpretations of many aspects of the Compact's negotiation and legislative history.  (Doc. 175 at 18-35, 53-58; Doc. 184 at 28-37.)  Both parties cite to extrinsic evidence in support of their positions with DRBC focusing on evidence suggesting a broad reading of DRBC's authority and WLMG focusing on evidence suggesting a more restrictive reading.  (*Id*.)  DRBC specifically cites the following as the key components of assessing the negotiation and legislative history tool identified by the Third Circuit as a guide for understanding the drafters' intent: the drafting history of the Delaware River Basin Advisory Committee  ("DRBAC"), the principal drafter of the Compact formed in 1956;  the U.S. Army Engineer District, Philadelphia, Report on the Comprehensive Survey of the Water Resources of the Delaware River Basin (1960, rev. 1961) ("Corps Survey" "Corps Report"); the 1959 report from the Syracuse University Research Group, *The Problem of Water Resources Administration with Special Reference to the Delaware River Basin* ("Syracuse Report"); and the legislative proceedings resulting in the approval of the Compact.  (Doc. 175 at 53.)

While DRBC and WLMG agree that water quality and pollution were concerns addressed during the negotiation and history of the Compact (*see*, *e.g.*, Doc. 175 at 18-20; Doc. 184 at 29), there is little consensus on how those concerns were embodied in the Compact and what information is properly considered in the inquiry.

An example of the parties' differing approaches to assessing the negotiation and legislative history of the Compact is the parties' consideration of two key building blocks of the Delaware Compact, the Corps Survey and Syracuse Report. Among other things, the Corps Survey recommended a program consisting of several multipurpose dams and reservoir projects to control and manage the water resources of the Basin. (Doc. 175 at 53.) The Syracuse Report recommended a federal-interstate agency to manage water resources in the Basin. (*Id*. at 54.)

WLMG's focuses its historical perspective almost exclusively on strict adherence to certain aspects of the Corps Survey and Syracuse Report. (Doc. 184 at 31-37). WLMG asserts that "project" in the Compact should be defined as the Corps traditionally used the term, i.e., as a term of art referring to "civil works in one of its general program areas, such as flood control and rivers and harbors[, where] . . . typical 'projects' included dams and reservoirs, hydroelectric plants, and navigation improvements." (Doc. 184 at 32.) In support of this interpretation, WLMG notes that, although the Corps had examined existing industrial water use in the Basin and tabulated the number of plants associated with various types of industry, "[n]owhere in its comprehensive, multi-volume 1961 report did the Corps

25

consider the hundreds of plants associated with these various industries, or any of their

component structures or equipment, to be "projects." (*Id.* at 35-36 (citing WLMG Ex. 15 at

53, Table 11.)  Regarding the guidance to be derived from the Syracuse Report, WLMG

maintains that it supports two conclusions:

> First . . . "Projects," as that term was used and understood by those involved in
> [sic] history and negotiation of the Compact, meant water resource
> development undertakings like reservoirs. Second, . . . by no means did those
> involved use or understand the term "project" to encompass individual pieces
> of equipment like the pieces of equipment identified in the Commission's
> motion.

(Doc. 184 at 37.)

DRBC's broader approach characterizes the Corps Survey as a "point of departure"

for the Commission (Doc. 175 at 53) and focuses on testimony from legislative hearings and

information contained in official reports beyond the Corps Survey and Syracuse Report (*id.*

at 55-58).  DRBC reviews the Corps Survey and Syracuse Report as points on a continuum

of the long-standing concern for the pollution of the Delaware River evidenced by the 1935

Interstate Commission on the Delaware River ("Incodel") and the understanding of the

DRBAC regarding water quality considerations at issue in drafting the Compact.  (Doc.

175 at 54-55.)  In 1958, the DRBAC stated the following in its Second Annual Report:

> "Throughout the Delaware River system various water quantity demands and
> their corresponding quality requirements exist at various points. Quantity and
> quality requirements impinge upon the other, and conflicts between users will
> increase as population and industrial growth proceeds. Although excellent
> progress in pollution control has been made in the Delaware over the past two
> decades, water quality in the Basin will always be a concern because of the

constantly changing patterns of water use. For the Delaware many important
needs in the water quality field still exist."

(Doc. 175 at 20 (quoting DRBAC Second Annual Report, Appendix A, 2 (1958) (Bush

Declaration Exhibit 6).)  Further along the continuum, DRBC points to various aspects of

legislative history including Department of Interior Secretary Stewart Udall's letter to the

Senate Judiciary Committee incorporated into the Senate Judiciary Report that the

Commission would have authority over control and development of water resources within

the Basin including "'water supply, pollution control, flood protection, watershed

management, recreation, hydroelectric power, and the regulation of withdrawals and

diversions of water.'"[3]  (Doc. 175 at 22-23 (quoting S. Rep. No. 87-854, 28-30 (1961) (Bush

Declaration Ex. 8)).)  DRBC further proffers Secretary Udall's explanation that "the Compact

'would grant . . . the [C]ommission sufficient power to control development' of the water

resources of the basin." (Id. at 23 (quoting S. Rep. No. 87-854, 28 (1961) (Bush Declaration

Ex. 8)).)  DRBC also points to the section of the Report which addresses the

constitutionality of the proposed Delaware Compact wherein it was stated that "water quality

and pollution control are examples of development of the Basin's navigable waters."  (Doc.

175 at 23 (citing S. Rep. No. 87-854, 36-39 (1961) (Bush Declaration Ex. 8)).)

Citing the same Exhibit, WLMG states that Secretary Udall's information provided to

the Senate Committee explains how Article 3 is intended to operate.

---

[3] Defendant maintains that Secretary Udall's letter to the Senate Judiciary Committee "convey[ed]
on behalf of all executive agencies their position on the Compact bill."  (Doc. 175 at 22.)

Secretary . . . Udall explained that there are two ways for the Commission to control "development" of the "water resources of the Basin." Commission Ex. 8 at 28-29. The Commission can construct and operate water resource development "projects" (Compact at §3.6(a)). *Id.* Alternatively, the Commission can review and approve "projects" constructed by private, local, State or federal authorities (Compact at §3.8). *Id.*

The options are parallel and coterminous; the Commission's authority to construct and operate projects is functionally equivalent to its authority to review and approve projects. **If the Commission does not have the authority to construct and operate a particular type of facility, then that type of facility is not a "project" subject to the Commission's project review jurisdiction**. Compare Compact §§3.6(a)-(b) with §3.8. The Commission lacks authority to construct and operate natural gas wells. *See* Compact at §3.6(b) (providing examples). It is without question, therefore, that the Commission also lacks authority to construct and operate the pieces of equipment involved in such undertakings.

(Doc. 184 at 29-30 (emphasis in original).)

The foregoing illustrates the parties' lack of consensus regarding insight into the

drafters' intent provided by negotiation and legislative history. Underscoring this divergence

is a disagreement on the intended flexibility of the Compact as asserted by DRBC based on

support from testimony of William Miller (a principal Compact drafter), DRBAC notes, and

the Compact itself. In support of its position, DRBC states the following:

during his testimony before the Pennsylvania Senate Legislative Committee, Miller also emphasized that the Compact language was deliberately flexible because it was not possible to anticipate all future water uses at the time the Compact was drafted. Miller stated that the Compact was drafted in a manner similar to a constitution. Delaware River Basin Compact: Hearing Before PA S. Legislative Comm., 57 (Mar. 28, 1961). Consistent with this approach, the DRBAC characterized the Compact as "a very flexible arrangement." Record of the Meeting of the Delaware River Basin Advisory Committee, 1 (Nov. 23, 1959). DRBAC also included in the Compact an express instruction to read the Compact's grant of authority broadly: "It is the legislative intent that the

provisions of [the] [C]ompact be reasonably and liberally construed." Compact,
§ 14.21.

(Doc. 175 at 58.)

Though WLMG does not address this proffered evidence in its opposition brief, it did

so in part in its response to paragraph 32 of DRBC's Concise Statement of Material Facts.

DRBC's Statement of Material Facts includes the following:

> The principal Compact drafter William Miller described drafting the Compact
> as, "writing a Constitution," such that the Compact was drafted to be sufficiently
> broad to address future occurrences that could not be anticipated at the time
> the Compact was being drafted. Delaware River Basin Compact: Hearing
> Before PA S. Legislative Comm., 57 (Mar. 28, 1961), attached to the Bush
> Declaration as Exhibit 11; Greenwald Dep. 165:13-18, Mar. 3, 2020, attached
> to the Motion as Exhibit I.

(Doc. 163-3 ¶ 32.)  Notably, WLMG disputed this factual averment as stated, adding that

> [w]hile Miller described drafting the Compact as, "writing a constitution," he also
> expressly recognized, in that same testimony, that if oil or gas were discovered
> in the Basin, that the Commission would not have jurisdiction over it, as the
> Commission's jurisdiction extended only to "water and related resources."
> WLMG Ex. 5 (Littlefield Deposition) at 135-137; WLMG Ex. 32 (Littlefield Ex.
> 18).

(Doc. 184 ¶ 32.)

A review of the cited portion of the deposition of Douglas Littlefield, Ph.D, an expert

retained by DRBC, reveals that the jurisdictional testimony was more nuanced than

portrayed by WLMG and does not include an express recognition that the Commission

would not have jurisdiction over oil or gas activity in the Basin if that activity involved water

resources.  (See WLMG Ex. 5, Littlefield Dep. 135:25-137:15 (Doc. 183-1 at 462).)

The examples set out above demonstrate that the negotiation and legislative history

of the Compact do not support a grant of summary judgment to DRBC on the claim it has

presented in its motion.

## 2. Course of Performance

As with the assessment of negotiation and legislative history, there is little consensus

on how DRBC's course of performance bears on the drafters' intent regarding project review

in § 3.8. Course of performance as discussed by the parties encompasses both the

projects reviewed in the Compact's history, and DRBC's post-enactment actions which they

consider relevant to the matter at issue in this case. (Doc. 175 at 35-43, 59-62; Doc. 184 at

37-47.)

In the latter category, DRBC's cited evidence includes a 1964 amendment to the

Comprehensive Plan which provided as follows:

> The underground water resources of the Basin shall be utilized, conserved,
> developed, managed and controlled in view of the needs of present and
> future generations, and of the resources available to them. To that end, the
> use, interference, impairment, **penetration** or artificial recharge of **an
> aquifer** or of any other underground water resource **shall be subject to
> review and evaluation under the Compact.**

(Doc. 175 at 38 (quoting DRBC Resolution 64-8 (1964) (emphasis added by DRBC)

(Bush Declaration Exhibit 13)).) DRBC follows with the statement that "WLMG's planned

wellbore, which will facilitate the return of wastewater to the surface, will penetrate an

aquifer and is subject to review in accordance with these resolutions, which were adopted

as Section 2.20.6 of DRBC's Water Code and incorporated into DRBC's Comprehensive

Plan." (Doc. 175 at 36-37 (citing 18 C.F.R. § 410.1; DRBC Resolution 64-11 (1964) (Bush

Declaration Exhibit 13)).)

DRBC maintains that it "reviews projects under Section 3.8 to ensure that they will

not impair the Comprehensive Plan." (Doc. 175 at 37.)   By way of example, DRBC states

that within the first few years following the formation of the Commission, DRBC's

> project review branch approved the water resources aspects of several
> petroleum products pipelines, pier, mooring and dock facilities, landfills,
> highways and bridges, electrical generation facilities, industrial facilities, and
> groundwater penetration activities.  Key individuals who participated in the
> drafting, negotiation, and enactment of the Compact were among the early staff
> of the DRBC, and were implementing the intent of the Compact's drafters.

(*Id.*)  DRBC then provides more detail on the projects referenced (*id.* at 38-42) and

concludes with the following summation:

> The Commission's first annual report published in 1963 details the
> various industrial, municipal and other projects reviewed by DRBC. In a section
> discussing the Commission's project review activities during its first year of
> existence, the report offers the following examples of projects that "could alter
> the natural flow of water, its quality and even the cost of water downstream,"
> and that required review for compatibility with the Comprehensive Plan: "dams,
> waste disposal installations, water supply systems and water using industries."
> DRBC 1963 Annual Report at 19 (emphasis added). The project review
> highlights from that year include, "two sewage treatment projects, six water
> supply operations, three multi-purpose watershed development programs, a
> pumped storage hydroelectric power plan [sic], and a high voltage line through
> a future reservoir site." *Id.*
>
> Similarly, DRBC's 1964 annual report identifies thirty-nine projects the
> Commission reviewed, including surface and ground water supplies, sewerage
> and sewage treatment facilities, industrial waste treatment operations,
> petroleum pipeline installations, docks and wharfs, bridge and ferry boat

operations, and stream encroachments, and notes that "water using industries" must be screened as projects under Section 3.8 for compatibility with the Comprehensive Plan. DRBC 1964 Annual Report at 8 (Bush Declaration Exhibit 26).

(Doc. 175 at 42-43.)

DRBC adds that its review of "water using industries" is consistent with the testimony of Compact Drafter William Miller's before the before the Pennsylvania Senate Legislative Committee that "such water uses would be subject to Commission review." (Doc. 175 at 60-61 (citing Delaware River Basin Compact: Hearing before PA S. Legislative Committee, 46-47, 57-58 (Mar. 28, 1961)).) DRBC further adds that such reviews in its earliest years included "those ensuring that several petroleum pipelines designed to traverse reservoir areas or stream crossings would protect the water resources" and notes that it "continues to review certain liquid petroleum pipelines and natural gas transmission lines, including those that traverse reservoir or recreation project areas designated in the Comprehensive Plan." (Doc. 175 at 61 & n.9 (citing Docket D-63-23; Commission's Rules of Practice and Procedure; 18 C.F.R. §§ 401.35(a)(11)-(13)).) DRBC analogizes the pipeline review to the vertical pipeline passing through an aquifer which occurs in natural gas development operations in that they pose a similar risk to a horizontal pipeline passing across a river or stream. (*Id.*) DRBC avers that the specific projects identified in its brief—"petroleum products pipelines, acid barge loading platform and related pipeline trestle and mooring cells, pier, landfill, wastewater treatment facility

and bridge"-- are all "different types of industrial undertakings [that] have in common a planned design or operation to protect water resources and [they] have all been reviewed by DRBC as projects."  (*Id*.)

Aside from the disagreement about the propriety of the 1964 amendment to the Comprehensive Plan, *see supra* pp. 10-11, WLMG also states that it does not concede that "the Commission's actions are properly considered 'course of performance[]' . . . because the Commission is not a party to the Compact.  Rather, it is an entity created by the Compact."  (Doc. 184 at 38-38.)  Notwithstanding this assertion, WLMG addresses DRBC's course of performance, stating generally that

> [b]ased on the evidence available to it to date, WLMG believes that the Commission has never treated individual pieces of equipment of the type identified in its motion as "projects." Never before has it zoomed-in like it has done with WLMG. More particularly, with respect to natural gas development, until quite recently, the Commission's view was that the "project" subject to review was the well pad together with all appurtenant equipment. Individual pieces of equipment were never deemed to be "projects" until now.

(Doc. 184 at 48.)

In support of its position that DRBC's current interpretation of "project" regarding only a portion of WLMG's planned natural gas activities is incorrect, WLMG first points to DRBC's recent course of performance as evidenced by the May 2009 Executive Director Determination that,

> for the purposes of natural gas development undertakings, "**a** project encompasses the drilling pad upon which a well intended for eventual production is located, **all** appurtenant facilities and activities related thereto **and** all locations of water withdrawals used or to be used to supply water to the

project." WLMG Ex. 42 at Ex. A.  Of particular import, the Commission did not say that the "project" consisted of the pad **or some** appurtenant facilities **or some** activities related thereto. It could have, but did not, use the word "or" or "some." Instead, evidencing that it agreed with and understood the plain meaning of the definition of "project," it used the words "and" and "all ." *Id.*

(Doc. 184 at 39-40 (emphasis in original).)

As for the projects individually identified by DRBC in support of its argument that its course of performance supports finding its planned activities and planned facilities for the purpose of managing wastewater and related uses of land are a project within the Compact, WLMG rejects that they are "projects" for a variety of reasons and asserts generally that "[a]bsent from the handful of outliers that the Commission cobbled together, are any examples of any 'project' review approvals for the thousands of residential, commercial and industrial developments that have been constructed in the Basin since 1961, much less for the component parts of those developments." (Doc. 184 at 47.)  WLMG further contends that, in each instance cited, DRBC "asserted 'project' review jurisdiction over the larger undertaking." (*Id.*)

Similarly, WLMG undermines the summaries presented in DRBC's annual reports. (Doc. 184 at 49.)  WLMG states that

until its recent assertion of jurisdiction over gas wells, and now their component parts, the Commission routinely exercised jurisdiction over prototypical water resource development and management projects. Doc. 175 at 42. The Commission reviewed water supply wells, industrial and public water supplies, wastewater treatment plants, navigation projects and surface water outtakes. *Id.* The Commission, however, did not review any of the thousands of

residential, commercial or industrial developments in the Basin or their component parts.

(Doc. 184 at 49-50.)

Although DRBC refutes WLMG's position in its reply brief (Doc. 191 at 27-32), the foregoing material demonstrates that significant disagreement exists regarding how the course of performance bears on the question of the intent of the Compact drafters regarding projecting review.  Each party has presented reasoned arguments with citation to extrinsic evidence in support of its position and the Court will not, at this stage of the proceedings, assess the merits of how course of performance informs the appropriate scope of review in § 3.8 of the Compact.

### 3.  Other Interstate Compacts

Both parties address the Susquehanna River Basin Compact, which was enacted in 1970 by the Commonwealth of Pennsylvania, the states of New York and Maryland and the federal government to place the comprehensive, multiple purpose planning of the conservation, utilization, development, management, and control of the water resources of the Susquehanna River Basin under the administration of a single, basin wide agency—the SRBC.[4]  (Doc. 175 at 43 (citing SRB Compact, Preamble, Section 2.1; Doc. 184 at 53.)  In assessing how the Susquehanna River Basin Compact ("Susquehanna

---

[4] The parties also acknowledge the Tahoe Regional Planning Agency ("TRPA") and the Tahoe Regional Planning Compact ("Tahoe Compact") and both recognize significant distinctions between the Tahoe Compact and the Delaware Compact.  (Doc. 184 ¶ 36; Doc. 191 at 39-40.)

Compact") bears on the question of the intent of the parties' in the Delaware Compact at issue here, the parties do not dispute that the definition of "project" is nearly identical. (Doc. 175 at 43; Doc. 184 at 53.) However, their fundamental disagreement on the similarity of the handling of natural gas development activities in the Susquehanna Compact and the Delaware Compact is apparent in their preliminary factual assertions and responses.

In its Concise Statement of Material Facts, DRBC states that "the Susquehanna River Basin ("SRBC") by regulation has identified unconventional natural gas development and hydrocarbon development as 'projects' as defined in the Susquehanna River Basin Compact, a definition similar to the definition of 'project' in the Delaware River Basin Compact." (Doc. 169-3 ¶ 36 (citing 18 C.F.R. § 806.3 (definitions of "unconventional natural gas development project" and "hydrocarbon development project"); Susquehanna River Basin Compact, P.L. 91-575, 84 Stat. 1059 *et seq.*, Section 1.2(7) (definition of "project")).) In its response, WLMG disputes DRBC's assertion as stated, explaining at the outset that

> [t]he SRBC's regulations acknowledge that 'unconventional natural gas development projects' and 'hydrocarbon development projects' are not undertaken 'for' the conservation, utilization, control, development or management of water resources, but instead are 'undertaken for the purpose of extraction' of hydrocarbons. 18 C.F.R. § 806.3. Moreover, what the SRBC has done by regulation has no bearing on the issue of whether WLMG's proposed natural gas activities are a "project" as defined by the Compact (or by the Susquehanna River Basin Compact "SRB Compact"). To the extent the SRBC considers natural gas development activities to be "projects" under the SRB Compact, its interpretation of that compact is equally flawed.

(Doc. 183 ¶ 36.) WLMG then posits that because the SRBC permits natural gas development activities "pursuant to a permit-by-rule process" persons seeking to develop

their natural gas rights have not had reason to challenge SRBC's jurisdiction.  (*Id*. (citing Doc. 175 at 45).)

In their respective briefs, DRBC focuses on the similarities between the Delaware Compact and Susquehanna Compact and WLMG focuses on the distinctions between the two.  (Doc. 175 at 43-46, 62-63; Doc. 184 at 53-54; Doc. 191 at 32-33.)  For the most part, the parties do so in the context of considering natural gas development activities as a single project.  (*Id*.)  As to the limited-scope of DRBC's "project" assertion with the current Motion, WLMG specifically states that

> the SRBC's regulatory definitions of "unconventional natural gas development project" and "hydrocarbon development project" do not zoom in on individual pieces of equipment and declare them to be projects that the SRBC has jurisdiction to review under SRB Compact. *See* 18 C.F.R. § 806.3. Rather, just like the Commission did before it discovered its new post hoc litigation interpretation, the SRBC's regulatory definitions of "unconventional natural gas development project" and "hydrocarbon development project" treat natural gas development as "a project" over which it has jurisdiction. *Id.* They do not, as the Commission attempts to do here, assert "project" review jurisdiction over the hoses, buckets, tanks, pumps, valves and other pieces of equipment comprising the larger undertaking.

(Doc. 184 at 53.)  In its reply brief, DRBC provides a section heading which asserts that "SRBC's Review of HVHF as projects supports DRBC's position that it is authorized to review, at a minimum, WLMG's wastewater management activities and facilities."  (Doc. 191 at 32.)  However, the text following this heading does not clearly articulate the conclusion asserted. (*See id*. at 32-33.)

Regarding the limited determination now sought in DRBC's Motion, on the current record the Court does not find that DRBC has shown that the Susquehanna Compact provides sufficient support for the grant of partial summary judgment to DRBC. In the broader context of whether the Susquehanna Compact and SRBC's actions support project review authority under § 3.8 of the Delaware Compact, neither party's argument is without facial merit. Therefore, the question of how other compacts inform our ascertainment of the Delaware Compact's drafters' intent will require factfinding not appropriate at this stage of the litigation.

## VI. CONCLUSION

The Court concludes that the ambiguity identified by the Circuit Court cannot be resolved on summary judgment given the dearth of agreed upon facts, the parties' divergent arguments based on citation to extrinsic evidence, issues of credibility whose resolution is inappropriate on summary judgment, particularly in connection with the parties' experts whose reports have been cited, and the plethora of extrinsic evidence that is not so one-sided as to allow the Court to decide the drafters' intent at this stage of the proceedings, *see 3Com Corp.*, 171 F.3d at 746–47. Further, given that much of the proffered evidence and the history of this case primarily address natural gas development activity as a whole, the Court finds it inadvisable to make any limited finding regarding the review now sought by DRBC (Doc. 169 at 43) or WLMG's claimed entitlement to summary judgment in its favor pursuant to Federal Rule of Civil Procedure 56(f)(1) (Doc. 184 at 4). With this

determination, the Court does not decide that a discrete aspect of a planned natural gas development undertaking could not be considered a "project" reviewable under § 3.8 of the Compact.  The Court simply finds that such a determination is not appropriate on summary judgment.

For the foregoing reasons, Defendant Delaware River Basin Commission's Motion for Partial Summary Judgment (Doc. 169) will be denied.  Plaintiff's request for summary judgment in its favor pursuant to Rule 56(f)(1) will also be denied.  A separate Order is filed simultaneously with this Memorandum Opinion.

Robert D. Mariani
United States District Judge